United States District Court
for the
Southern District of Florida

| | | |
|---|---|---|
| Talegrand Noel, Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 18-23595-Civ-Scola |
| Aqua Vista Townhomes | ) | |
| Condominium Association, Inc. and | ) | |
| other, Defendants. | ) | |

## Order Granting Motions to Dismiss

Plaintiff Talegrand Noel complains Defendants Aqua Vista Townhomes Condominium Association, Inc., Michael Rabinovich, Maya Vinokurov, and Daniela Adams discriminated against him when he attempted to purchase property at the Aqua Vista townhome community in North Miami Beach, Florida. (2nd Am. Compl.,[1] ECF No. 39.) Defendants Rabinovich and Vinokurov (collectively the "Owners") are the former owners of a townhome in Aqua Vista, which Noel rented for several years and which he says he tried to purchase. Defendant Adams is the president of the Defendant Condominium Association. According to Noel, the Defendants all denied him the opportunity to purchase the Owners' unit because of his race and nationality. In response, the Defendants ask the Court to dismiss the complaint because, among other reasons, Noel has failed to state a claim upon which relief may be granted. (Adams and Assoc.'s Mot., ECF No. 45; Owners' Mot., ECF No. 46.) After careful review, and in consideration of Noel's responses (ECF Nos. 55, 56) and the Defendants' replies (ECF Nos. 59. 61), the Court **grants** the Defendants' motions to dismiss (**ECF Nos. 45, 46**.)

## 1. Background[2]

Noel, who describes himself as black and Haitian, moved into a townhome is the Aqua Vista 2 division of the larger Aqua Vista community complex, in December 2012, in North Miami Beach, Florida. (2nd Am. Compl. at ¶ 8.) Noel says he rented his unit "without issue" until the Owners asked him to vacate the property sometime in 2017.

---

[1] The Court struck Noel's first amended pleading because it was a shotgun pleading.

[2] The Court accepts the complaint's factual allegations, as set forth below, as true for the purposes of evaluating the motion to dismiss. *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997). As an aside, the Court notes Noel's recitation of facts is not a model of clarity but the Court relays the gist of his story, affording him the most favorable interpretation it can based on what he has presented.

At some point during his tenancy, Noel doesn't specify when, he discussed the possibility of buying his unit with Vinokurov, one of the unit's two owners. (*Id*. at ¶ 11.) Noel does not describe any of the particulars of or conclusions reached as a result of that discussion. But, it appears the discussion was not fruitful because, thereafter, on March 15, 2017, the Owners notified Noel by email and certified letter that he must vacate the property by May 15 so that the Owners could renovate the property and "put it up for sale." (*Id*. at ¶ 12.) Noel says this prompted him to start seeking a mortgage loan and to begin working with a real estate agent. (*Id*. at ¶ 13.) Noel and Vinokurov then "began negotiating a price, before coming to an agreement, with [Noel] paying rent until the closing."[3] (*Id*.) Although Noel and Vinokurov, but not Rabinovich, may have "com[e] to an agreement" on a price, Vinokurov, "while waiting on a draft of an agreement," which would have included the other terms of the potential deal, nonetheless continued, in the meantime, to show the property to other potential buyers. (*Id*. at ¶ 14.) Days later, Vinokurov notified Noel "that she no longer wanted to sell." (*Id*. at ¶ 15.) Noel does not specify the timeline of these prior events but says that, on May 31, Vinokurov emailed Noel again, telling him to vacate the property and advising that "based on the current real estate market," she would be selling the unit. (*Id*. at ¶ 16.) Noel responded to Vinokurov's email the next day, asking her "how much she really wanted for the unit." (*Id*. at ¶ 17.) Vinokurov wrote back, telling Noel that "she hoped [he] will find another nice place to live with his family." (*Id*. at ¶ 18.)

At that point, even though Noel was aware that Vinokurov was not interested in pursuing an arrangement with him to buy her unit, he says he was "undeterred," and told Vinokurov, a week or so later, on June 14, he would buy the unit "for the amount of the appraisal." (*Id*. at ¶ 19.) Vinokurov replied the next day telling Noel that the unit had already been sold. (*Id*. at ¶ 20.)

It appears that while Noel's discussions with Vinokurov were taking place, Noel had also contacted Adams, the Aqua Vista association president, about purchasing Vinokurov's unit and other, unidentified, units in Aqua Vista 2. (*Id*. at ¶¶ 21–23, 25, 28.) Noel describes a series of interactions he had with Adams but does not specify when these occurred, either generally or in relation to the discussions he had had with Vinokurov. In any event, Adams "deterred [Noel] away from Vinokurov's property," "steer[ing] [him] from Aqua Vista 2," encouraging him to "buy either in Miami Gardens or another unit located at . . . Aqua Vista 1," rather than Aqua Vista 2. (*Id*. at ¶¶ 21–22.) Adams also insisted that Vinokurov's unit would be too expensive for Noel, telling his real

---

[3] Reading this poorly worded fact in light most favorable to Noel, it appears Noel and Vinokurov agreed on a price, as to the sale, but nothing more.

estate agent as much, and also refusing to facilitate access to Aqua Vista 2 so that he could look at other properties. (*Id.* at ¶ 22–24.) Adams also refused to give him "information and documentation requested by [his] real estate agent and lender" and would not "schedule an appointment for [him] or his daughter to submit the application for approval of the transfer by the . . . Association." (*Id.* at ¶ 25.) Noel does not specify what information and documents he requested nor does he explain which unit or units he sought transfer approval for. Adams also rebuffed Noel's daughter's multiple attempts to deliver his "application package" for an unspecified transaction, apparently advising that Noel "alone had to be the one to submit the application." (*Id.* at ¶ 26.) Noel's real estate agent also offered, in some unspecified way, to bring the application in for Noel "but received no response." (*Id.* at ¶ 27.) Ultimately, says Noel, Adams relented and "finally took the application with the money for the application that goes with it." (*Id.* at ¶ 28.) It appears all for naught, however, because "the property did not appraise for the contract price at [that] time." (*Id.*) It's not clear whether "the property" Noel refers to is the Owners' unit or some other unit at Aqua Vista. In any event, recounts Noel, in the end, Vinokurov sold her unit "to people like herself, to wit, 'Valeri Tamarov and Larissa Tamarova, husband and wife, and Irina Tamaraova, a single woman, as joint tenants with rights of survivorship'." (*Id.* at ¶ 29.)

## 2. Legal Standard

A court considering a motion to dismiss, filed under Federal Rule of Civil Procedure 12(b)(6), must accept all allegations in the complaint as true, construing them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). Although a pleading need only contain a short and plain statement of the claim showing that the pleader is entitled to relief, a plaintiff must nevertheless articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Faced with a motion to dismiss, a court should therefore "1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their accuracy and then determine whether they plausibly give rise to an entitlement to relief.'" *Am. Dental Ass'n. v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 662 (2009)). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting Fed. R. Civ. P. 8(a)(2)) (internal punctuation omitted). A

court must dismiss a plaintiff's claims if he fails to nudge his "claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

### 3. Discussion

Noel alleges all four Defendants denied him the opportunity "to purchase at the Aqua Vista II portion of the Aqua Vista Condominium" based on his "color and nationality." (*E.g.*, 2nd Am. Compl. at ¶¶ 33, 38, 43, 48.) Section 3604(a) of the Fair Housing Act makes it unlawful, on the basis of someone's race, color, or national origin, (1) to refuse to sell a dwelling after the making of a bona fide offer, (2) to refuse to negotiate for the sale of a dwelling, or (3) to otherwise make unavailable or deny a dwelling. 42 U.S.C. § 3604(a).[4] Although a plaintiff can succeed in alleging a § 3604(a) claim based on both disparate treatment and disparate impact theories, Noel's complaint has only alleged the Defendants' liability based on disparate treatment.[5]

Regarding disparate treatment, "[a] plaintiff may establish a violation of the FHA either through direct evidence of discrimination or through the *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) burden-shifting framework." *Martin v. Brondum*, 535 Fed. App'x 242, 244 (4th Cir. 2013). "Direct evidence encompasses conduct or statements that both (1) reflect directly the alleged discriminatory attitude, and (2) bear directly on the contested [housing] decision." *Id.* (quotations omitted). Under the *McDonnell*, framework, a plaintiff must allege: (1) he is a member of a protected class, (2) he applied for and was qualified to purchase the identified dwelling; (3) the defendants rejected him; and (4) the dwelling thereafter remained available. *Sec'y, U.S. Dept. of Hous. & Urban Dev., on Behalf of Herron v. Blackwell*, 908 F.2d 864, 870 (11th Cir. 1990).

Regardless of the method used to establish the § 3604(a) violation, and as Noel himself concedes in one of his responses, "the FHA requires a close causal link between housing and the disputed action." (Pl.'s Resp. to Adams and Assoc.'s Mot. at 6 (quoting *United States v. Bankert*, 186 F. Supp. 2d 623, 628 (E.D.N.C. 2000)).) Here, as all four Defendants have argued, Noel has not

---

[4] Noel actually cites 42 U.S.C. § 3604(f)(1) in his complaint. But this section addresses housing discrimination on the basis of a disability. Noel acknowledges this was a typographical error and that he meant to rely on § 3604(a). The Court, therefore, evaluates Noel's complaint on the basis of § 3604(a).

[5] The Court also notes that although Noel vaguely alludes to the standard for pleading a claim for disparate impact, he never argues in his responses to either motion to dismiss that he has pleaded any disparate impact claims. (*See* Pl.'s Resp. to Adams and Assoc.'s Mot. at 4 (mentioning the standard); Pl.'s Resp. to Owners' Mot. at 3 (same).)

set forth any facts from which the Court could find that the Defendants intentionally discriminated against him.

Instead, Noel has simply pleaded a mishmash of events surrounding his failed negotiations regarding his attempt to purchase the townhome he had been renting. Although Noel and Vinokurov may have agreed on a price for the unit, Noel has not alleged a single fact supporting his conclusory allegation that Vinokurov's decision to ultimately sell to someone else was based on his race or national origin. This is so even if the Court were to interpret Noel's factual allegations as showing that the Owners somehow tricked Noel or lied to him about selling the property. Alleging underhandedness or deceit during a real estate transaction, without more, does not alone amount to discriminatory treatment. *See Hallmark Developers, Inc. v. Fulton County, Ga.*, 466 F.3d 1276, 1283 (11th Cir. 2006) ("In order to prevail on a claim under the FHA, a plaintiff must demonstrate unequal treatment on the basis of race that affects the availability of housing" and that "race played some role in the decision.") (quotations omitted).

Additionally, to the extent Noel believes his allegation that "Vinokurov instead sold her unit to people like herself" establishes some sort of racial animus, his contention falls flat. To begin with, the Court must pile inference upon inference to discern what this even means. Perhaps Noel means to say that Vinokurov herself is neither black nor Haitian, as Noel describes himself. And, that she sold her unit to other people who are neither black nor Haitian. In his response to the Owners' motion, Noel says that the buyers' names "suggest[ed]" they "were Russian or of Russian descent, just as Vinokurov herself." (Pl.'s Resp. to Owners' Mot. at 5.) But, just because Noel's negotiations with Vinokurov did not result in his purchase of the property and the Owners ultimately sold their unit to someone who was, apparently, neither black nor Haitian, does not mean the Owners acted with discriminatory intent. No matter how "sudden" (2nd Am. Compl. at ¶ 12), "astonish[ing]" (*id.* at ¶ 20), or "strange[]" (Pl.'s Resp. to Owners' Mot. at 5) Noel thought the Owners' actions were, he has simply not alleged a single fact, either circumstantial or direct, that either Owner discriminated against him.[6]

Nor do Noel's allegations regarding Adams and the Association fare any better. Viewing the factual allegations in the light most favorable to Noel, the Court finds, at best, Adams possibly treated Noel poorly: she declined to help him look at other properties at Aqua Vista 2; she refused to give him certain "information and documentation"; she made it difficult for Noel to drop off

---

[6] Although Noel has pleaded separate claims against both Owners, none of the pertinent factual allegations implicate Rabinovich individually.

some kind of transfer application; and she told his real estate agent Noel could not afford to buy a property at Aqua Vista 2.

First, regarding Noel's allegations, there is no indication that Adams had any responsibility at the complex for facilitating the showing of units or for giving him the information and documentation he asked for. Next, Noel does not explain why Adams's reluctance to accept the application was improper, never mind discriminatory. What was the application for? Was it something that even should have been accepted at the time it was presented? Why was it Adams's duty to process Noel's application? Was he being required to do something that other applicants were not? Lastly, Noel does not provide any facts to show that it was discriminatory for Adams to tell Noel's realtor that he could not afford any of the units at Aqua Vista 2. It might have been in poor taste; it might have been untrue (the complaint doesn't say); and it might have been none of her business. But without more, such allegations do not provide any facts from which the Court can discern any semblance of a plausible claim against Adams, and certainly not against the Association, of racial or nationality discrimination under the FHA. Simply put, "the Fair Housing Act does not provide relief based on a plaintiff's sheer allegation or conjecture that the complained of behavior was related to race or disability." *Hunt v. Holloway*, 1:09-CV-3137-AT, 2012 WL 13071545, at *4 (N.D. Ga. Feb. 10, 2012); *see also Carmona-Rivera v. Puerto Rico*, 464 F.3d 14, 18 (1st Cir. 2006) ("Merely labeling [an action or inaction] intentional discrimination, without some modicum of evidence demonstrating an actual discriminatory animus, is itself not enough.")

Lastly, Noel also does not set forth facts that would satisfy his initial burden under the *McDonnell* framework because he does not properly allege he was qualified to purchase either the Owners' unit or any other unit. Instead, Noel merely alleges, at best, that he sought a mortgage loan and agreed, at one point, through discussions with one of the Owners of his rental unit, on a price. (2nd Am. Compl. at ¶ 13.) He never alleges that he actually qualified for the loan or that any other terms, aside from price, were agreed upon between the parties. In fact, there is no allegation that an actual agreement about the transaction ever ensued: Noel himself says that after he and Vinokurov agreed on a price, "while waiting on a draft of the agreement, Vinokurov continued to show the property to potential buyers." (*Id.* at ¶ 14.) Further, Noel never opines on Rabinovich's participation in the negotiations. Certainly, no agreement on price could be reached without the input and acquiescence of the second owner. Nor does Noel's allegation that he told Vinokurov that "he was ready to buy [the unit] for the amount of the appraisal" save him. (*Id.* at ¶ 19.) Simply announcing one is "ready to buy," does not equate to being actually qualified to make a specific purchase. Plus, at the time Noel allegedly told Vinokurov he

was "ready to buy," the referenced appraisal had not even yet occurred. Lastly, Noel's allegation that, ultimately, "the property did not appraise for the contract price" (*Id.* at ¶ 28) completely undermines any claim that he was actually qualified to make the only purchase he identifies in his complaint. *See Staten v. D.R. Horton, Inc.-Birmingham*, 2:17-CV-00376-SGC, 2018 WL 3418168, at *4 (N.D. Ala. July 13, 2018) (finding plaintiffs failed to show they were qualified to purchase property where the plaintiffs did not have financing to close the deal). By failing to allege any facts showing that he was indeed qualified to make the purchase, Noel dooms his claims under the *McDonnell* framework.

### 4. Conclusion

Although Noel may have been frustrated by his inability to purchase the Owners' unit and felt that he was mistreated by all of the Defendants in one way or another, he did not ever link the Defendants' actions, either directly or circumstantially, to any discriminatory intent. For the reasons set forth above, the Court **grants** the Defendants' motions to dismiss (**ECF Nos. 45, 46**). Because Noel has now failed three times to properly plead his claims, the Court **dismisses** Noel's claims **with prejudice**.

The Clerk is directed to **close** this case. Any pending motions are **denied as moot**.

**Done and ordered**, at Miami, Florida, on September 12, 2019.

_____
Robert N. Scola, Jr.
United States District Judge